## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 13 2015, 8:55 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lamont Hudgins,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

November 13, 2015

Court of Appeals Case No.
49A02-1505-CR-332

Appeal from the Marion Superior
Court

The Honorable Lisa F. Borges,
Judge

Trial Court Cause No.
49G04-1407-F5-36316

**Brown, Judge.**

[1] Lamont Hudgins appeals his conviction for battery against a public safety official as a level 5 felony, and his sentence for two counts of battery against a public safety official as level 5 felonies and one count of battery against a public safety official as a level 6 felony. Hudgins raises two issues which we revise and restate as:

    I.    Whether the evidence is sufficient to sustain his conviction for one count of battery against a public safety official as a level 5 felony; and

    II.    Whether his sentence is inappropriate in light of the nature of the offense and the character of the offender.


We affirm.

### Facts and Procedural History

[2] Hudgins was a resident or inmate of Duvall Residential Center (the "Center"), which is a "Community Corrections facility where offenders are finishing out or also transitioning into the community while they finish out their sentence." Transcript at 6. Officer Brian Erdmann, a police officer for the Clermont Police Department, did part-time work at the Center through Protection Plus which has a contract through Marion County Community Corrections. While working at the Center, Officer Erdmann retained his arrest and police powers, and his duties included assisting the staff in any of their duties and handling warrants or arrests.

[3] On July 21, 2014, Hudgins came in from work and complained that he wanted a "lunch sack, breakfast sack, or a sack for him . . . to eat." *Id.* at 7. Frank Gunn, a shift supervisor at the Center, advised Hudgins that pursuant to the

Center's policy he could not obtain a sack but they "were getting ready to have chow so he would be able to eat then." *Id.* Hudgins went "in the back" and instead of "eating his tray, he actually threw his tray up against the wall." *Id.* at 8.

[4] Officer Erdmann was in the control room and heard a radio call through the Center that there was a disruptive resident in the cafeteria and assistance was needed. He proceeded down the hallway with Supervisor Gunn. Officer Erdmann observed Hudgins enter the cafeteria, turn, run to the furthest entrance into the hallway, and approach him. He and Hudgins stood face to face, Officer Erdmann asked him what the problem was, and Hudgins said that "he hadn't gotten a sack lunch the night before and he was angry about that." *Id.* at 19. Officer Erdmann told Hudgins that he needed to calm down and relax and said: "That was last night. You've got a hot meal now. Sorry that it happened but why get rid of your hot food that you have just received over being upset about a sack lunch the night before?" *Id.* Hudgins was "pretty agitated," "didn't want to hear" what Officer Erdmann had to say, and did not want to have a conversation with him. *Id.* Officer Erdmann told Hudgins that he needed to go down to the holding cell and calm down, and warned him that if he did not, he would be arrested for disorderly conduct because he was causing quite a disturbance within the facility.

[5] At some point, Anthony Pappas, a police officer who was working as a shift supervisor at the Center, heard the commotion, went down the hallway, observed that Hudgins was highly agitated, and attempted to calm him down.

Hudgins eventually walked to the holding cell escorted by Officer Erdmann, Supervisor Gunn, Officer Pappas, and Officer Timothy Moore, a residential officer at the Center.

[6] Once they arrived at the holding cell, Hudgins was still irritated, cursing, and being loud. Officer Pappas offered a compromise of being handcuffed in front instead of in the back, but Hudgins did not accept the offer. Officer Erdmann said: "Look. You need to turn around and get cuffed up. You know it is policy and you know that you have to be cuffed to the bench and all we are trying to do is get you to calm down and not escalate the situation." *Id.* at 22. Hudgins continued shouting and cursing, and Officer Erdmann retrieved his pepper spray and told him at least three times that he needed to be handcuffed to the bench or he would be sprayed. Hudgins said he was "pretty much getting ready to throw down with" them, "[i]f you spray me, I am kicking your ass," and "[y]ou cuff me, it's going to be on." *Id.* at 10, 23.

[7] Officer Erdmann sprayed Hudgins in his right eye, and Hudgins "really blew up then" and was "very agitated and upset." *Id.* at 23. He made fists, lunged at the officers, started swinging violently, and struck Officer Erdmann's upper torso, arms, and shoulder area with both of his fists, and on the left jaw which caused pain, bruising, and a small amount of swelling. Hudgins struck Officer Pappas, who was wearing glasses, between the eyes and on the side of the face, causing a cut across the bridge of his nose and swelling. Hudgins also struck the left side of Officer Moore's face and grazed the side of his jaw.

[8] Officer Erdmann and the others struggled with Hudgins and eventually subdued his arms and placed him in handcuffs, took him to the medical area, and decontaminated his face and eyes. In the process, Hudgins said to Officer Erdmann: "I'm sorry. That wasn't meant for you guys." *Id.* at 33. Hudgins said that it was meant for Supervisor Gunn. He also apologized to Officer Pappas for striking him and told Officer Moore that "it was not against" him. *Id.* at 55.

[9] On July 22, 2015, the State charged Hudgins with: Count I, battery against a public safety official as a level 5 felony relating to Hudgins's acts against Officer Erdmann; Count II, battery against a public safety official as a level 5 felony for his acts against Officer Pappas; and Count III, battery against a public safety official as a level 6 felony for his acts against Officer Moore. On March 27, 2015, the court held a bench trial and found Hudgins guilty as charged.

[10] On April 22, 2015, the court held a sentencing hearing in this case as well as cause number 49G04-1408-F4-39542 ("Cause No. 542").[1] The prosecutor argued for a sentence of four years in this case and ten years in Cause No. 542, for an aggregate sentence of fourteen years. Defense counsel requested a sentence of three years in this case and six years in Cause No. 542, for an aggregate sentence of nine years.

---

[1] Cause No. 542 involved charges of prisoner possessing a deadly weapon, battery by means of a deadly weapon, and battery resulting in serious bodily injury.

[11] The court found the fact that Hudgins was serving an executed sentence at the time of the offenses and had a criminal history as aggravating factors, stating, "I was trying to sort out some of the reasons that might have been behind some of the criminal activity. I do see that the defendant has had not really a whole lot of support." *Id.* at 85. The court also stated that Hudgins had a "rocky time getting out of school, probably partly because of the ADHD that [he] was diagnosed with early on" and that "without any special ed classes [it was] harder for you to maybe mainstream and do the same thing that some of the guys that you were in school with were doing . . . ." *Id.* at 86. The court observed that Hudgins started using marijuana and drinking alcohol and had used heroin, K-2 or Spice, and Xanax, and sentenced him to five years each for the two level 5 felonies and one year for the level 6 felony, all concurrent for an aggregate sentence of five years in this case. The court also ordered that Hudgins serve six consecutive years for Cause No. 542 for a total aggregate sentence of eleven years.

## *Discussion*

### I.

[12] The first issue is whether the evidence is sufficient to sustain Hudgins's conviction for Count I, battery against a public safety official as a level 5 felony

for his acts against Officer Erdmann.[2]  When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict.  *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007).  We do not assess witness credibility or reweigh the evidence.  *Id.*  We consider conflicting evidence most favorably to the trial court's ruling.  *Id.*  We affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt."  *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)).  It is not necessary that the evidence overcome every reasonable hypothesis of innocence.  *Id.* at 147.  The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.  *Id.*

[13]  Ind. Code § 35-42-2-1(b) governs the offense of battery and provides that "a person who knowingly or intentionally: (1) touches another person in a rude, insolent, or angry manner . . . commits battery, a Class B misdemeanor."  "The offense described in subsection (b)(1) . . . is a Level 5 felony if . . . [t]he offense results in bodily injury to . . . [a] public safety official while the official is engaged in the official's official duties."  Ind. Code § 35-42-2-1(f).  A "public safety official" means

---

[2] Hudgins does not challenge his convictions for Counts II and III related to his acts against Officer Pappas and Officer Moore.

(1) a law enforcement officer, including an alcoholic beverage enforcement officer;

(2) an employee of a penal facility or a juvenile detention facility (as defined in IC 31-9-2-71);

(3) an employee of the department of correction;

* * * * *

(6) a community corrections worker . . . .

Ind. Code § 35-42-2-1(a).

[14] Hudgins cites *Cupello v. State*, 27 N.E.3d 1122 (Ind. Ct. App. 2015), in which a panel of this court addressed a conviction for battery on a law enforcement officer and held that "it is the State's burden to prove by objective evidence that a citizen who has encountered a law enforcement officer either knew or should have known that he was dealing with an officer . . . ." 27 N.E.3d at 1128. The court also held:

> [W]here the State seeks to prove that an off-duty law enforcement officer is engaged in the execution of his official duties, it must satisfy a two part test: the State must prove by objective evidence that (1) the nature of the acts performed demonstrate that the officer sought to enforce the law to maintain peace and order for the benefit of the public; and (2) the citizen knew or should have known both that the person was an officer and that the officer was acting in his official, and not his private, capacity.

*Id.*

Hudgins argues that the State "did not prove Erdmann was a law enforcement officer engaged in his official duties." Appellant's Brief at 6. He concedes that Officer Erdmann was a law enforcement officer but asserts that it is not sufficient because the "issue is whether he was engaged in his official duties as a police officer when he was working off-duty for Protection Plus at [the Center] at the time of the battery." *Id.* Hudgins then asserts that "the State has met only the first prong of the *Cupello* two-part test" and "concedes the State proved that Erdmann acted as a police officer because the evidence showed he sought to enforce the law and to maintain peace and order when he responded to the radio call to deal with a disruptive inmate." *Id.* at 8. He contends that "[b]ecause of the lack of evidence that Hudgins knew or should have known Erdmann was a police officer, the State has failed to meet the second prong of *Cupello* and cannot show Erdmann was a law enforcement officer engaged in his official duties." *Id.* at 9. Hudgins then asserts that the State did not prove Officer Erdmann was a community corrections worker engaged in his official duties because there was no evidence that Officer Erdmann worked for the Center or had any employment or agency relationship with the Center that would make him a community corrections worker. His position is that Officer Erdmann's relationship with the Center is similar to that of a handyman employed by an outside company that contracts with the Center to make repairs, and that there would be no reason to consider a handyman to be a community corrections worker under the statute.

[16] The State argues that the evidence was sufficient to show that Officer Erdmann was a public safety official because he was a law enforcement officer and a community corrections worker. The State discusses *Cupello* and observes that the court in *Cupello* formulated a two-part test. The State points out that Officer Erdmann warned Hudgins that he would be arrested for disorderly conduct, and that Officer Erdmann was carrying handcuffs and pepper spray, items typically carried by law enforcement officers. The State also asserts that Officer Erdmann was a community corrections worker engaged in his official duties and that off-duty police officers that are hired to work security at a community corrections work release facility are within the realm of those intended to be protected by the public safety official designation because they work with inmates. It states that Hudgins attempts to create an artificial distinction between those whose paychecks are actually signed by the community corrections facility and those who are contracted to work there by a third party.

[17] We note that neither party cites *Owens v. State*, 742 N.E.2d 538, 540 (Ind. Ct. App. 2001), *trans. denied*, which reached a different result than that in *Cupello*.[3] In *Owens*, an undercover officer was battered by Eltonyo Owens. 742 N.E.2d at 540. After being convicted of battery resulting in bodily injury to a law enforcement officer, Owens argued on appeal that the State was required to prove that he knew that the undercover officer was a law enforcement officer

---

[3] The panel in *Cupello* did not discuss *Owens*.

when he struck him in order to convict him for battery of a law enforcement officer. *Id.* at 540-542. A panel of this court held that "because we find that the State was not required to prove that Owens knew that [the officer] was a police officer, we find that the evidence is sufficient to convict Owens for battery of a law enforcement officer." *Id.* at 542-543. The court held:

> In making this determination, we must consider two statutes. Ind. Code § 35-41-2-2(d) provides that "if a kind of culpability is required for commission of an offense, it is required with respect to every material element of the prohibited conduct."[4] Ind. Code § 35-42-2-1(a)(2) provides that:
>
>> a person who knowingly or intentionally touches another person in a rude, insolent, or angry manner commits battery, a Class B misdemeanor. However, the offense is: a Class D felony if it results in bodily injury to a law enforcement officer while the officer is engaged in the execution of his official duty.
>
> The conduct prohibited in a battery is the rude, insolent, or angry touching, and this is the conduct that must be done knowingly or intentionally by the actor. *Markley v. State*, 421 N.E.2d 20, 21 (Ind. Ct. App. 1981). Moreover, "bodily injury to a law enforcement officer" is an element of the battery offense and it must be proven beyond a reasonable doubt before there can be a battery conviction resulting in injury to a law enforcement officer. *See id.*

---

[4] Ind. Code § 35-41-2-2 has not been amended since *Owens*.

In *Markley*, we noted that "prohibited conduct" and "element" within Ind. Code § 35-41-2-2(d) are not synonymous and if the legislature had intended culpability to apply to every material element, the phrase "of the prohibited conduct" would be superfluous. *Markley*, 421 N.E.2d at 21. We agree and hold that the element of "bodily injury to a law enforcement officer" is an aggravating circumstance, which, if proven beyond a reasonable doubt, increases the penalty for the offense committed without proof of any culpability separate from the culpability required for the conduct elements of the offense. *See id.* Therefore, the legislature determined that the aggravating circumstance of battery resulting in bodily injury to a law enforcement officer was sufficient to increase the gravity of a battery offense because of the increased threat of injury to law enforcement officers. Moreover, this reasoning, coupled with the fact that "results in bodily injury to a law enforcement officer" is just that, a result, rather than prohibited conduct, leads us to the conclusion that Ind. Code § 35-41-2-2(d) does not apply to the "results in bodily injury to a law enforcement officer" element of a Class D felony battery.

Thus, the State was not required to prove beyond a reasonable doubt that Owens knew that Officer Hamner was a law enforcement officer when Owens struck him in the face. Moreover, the evidence is sufficient to convict Owens for battery of [a] law enforcement officer as a Class D felony.

*Id.* at 543.

[18] While we recognize there is tension between *Cupello* and *Owens*, we conclude that Hudgins is not entitled to reversal under either approach. Under *Owens*, Hudgins is not entitled to reversal because he concedes that the State demonstrated that the nature of Officer Erdmann's acts demonstrated that he

was acting as a law enforcement officer, and *Owens* does not require that Hudgins knew that Officer Erdmann was a public safety official, i.e., either a law enforcement officer or a community corrections worker.

[19] Under the test mentioned in *Cupello*, we observe that there was no discussion in that case regarding whether the public safety official was a law enforcement officer or a community corrections worker as is the case here. Thus, we conclude that the appropriate test under *Cupello* would be whether the State proved that Officer Erdmann was a *public safety official* engaged in his official duties and whether Hudgins knew or should have known that Officer Erdmann was a *public safety official* acting in his official capacity. We note that the charging information did not allege whether Officer Erdmann was a law enforcement officer or a community corrections worker. Rather, the State charged that Hudgins "did knowingly or intentionally touch Brian Erdmann, *a public safety officer*, in a rude, insolent, or angry manner, while Brian Erdmann was engaged in the execution of his official duties, resulting in bodily injury, that is: swelling and pain to left side of face and/or jaw." Appellant's Appendix at 17 (emphasis added). As noted, Ind. Code § 35-42-2-1(a) defines a "public safety official" as including a law enforcement officer or a community corrections worker. Further, even assuming that the word "knowingly" applied to Hudgins's understanding that Officer Erdmann was a public safety official, we observe that Ind. Code § 35-41-2-2(b) provides that "[a] person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so."

[20] Based upon the record, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found that Hudgins was aware of a high probability that Officer Erdmann was a public safety official and was acting in his official capacity, and committed battery against a public safety official as a level 5 felony for his acts against Officer Erdmann.

## II.

[21] The next issue is whether Hudgins's sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[22] Hudgins asks that we revise his total sentence from five years to four years, the sentence requested by the prosecutor at the sentencing hearing. He argues that his offenses in this case are not more egregious than a typical battery on a public safety official, and that the injuries suffered by Officer Erdmann and Officer Pappas were relatively minor. He also contends that his criminal history is offset by the mitigating circumstances of his untreated mental health issues and related substance abuse.

[23] Our review of the nature of the offense reveals that Hudgins, a resident or inmate of the Center, a community corrections facility, complained that he wanted a lunch sack and threw his tray against the wall. After being told to calm down, he remained agitated, caused a disturbance, cursed, and shouted. Officer Erdmann warned him at least three times that he needed to be handcuffed or he would be sprayed, and Hudgins said he was "pretty much getting ready to throw down with" them, "[i]f you spray me, I am kicking your ass," and "[y]ou cuff me, it's going to be on." Transcript at 10, 23. After being sprayed, Hudgins made fists, lunged at the officers, started swinging violently, and struck Officer Erdmann, Officer Pappas, and Officer Moore. Officer Erdmann suffered pain, a bruise, and swelling, and Officer Pappas suffered a cut across the bridge of his nose and swelling.

[24] Our review of the character of the offender reveals that Hudgins apologized to the officers after the offenses but said that his actions were meant for Supervisor Gunn. As a juvenile, Hudgins was adjudicated delinquent for two counts of criminal mischief in 2000. As an adult, Hudgins was convicted of carrying a handgun without a license as a class A misdemeanor in 2003; "Auto Theft; Receiving Stolen Property" as a class D felony in 2004; "Theft; Receiving Stolen Property" as a class D felony in 2006; "Theft; Receiving Stolen Property" as a class D felony in 2007; two counts of carrying a handgun without a license in 2008; and operating a vehicle never having received a license as a class C misdemeanor, two counts of possession of cocaine as class D felonies, resisting law enforcement as a class A misdemeanor, and two

counts of carrying a handgun without a license in 2011. Appellant's Appendix at 55-56. At the sentencing hearing, Hudgins was also sentenced in Cause No. 542, which involved another battery.

[25] The presentence investigation report ("PSI") reveals that Hudgins described family life throughout his childhood as fair and that his childhood was good until he became a teenager when he "tried to choose [his] own path." *Id.* at 59. He credited his grandmother as the person most responsible for his upbringing and denied he was ever the victim of any type of abuse or neglect. He reported that he moved from his home when he was fifteen years old to stay with friends and that much of his childhood was "spent living on the streets, fending for himself." *Id.*

[26] The PSI also states that Hudgins was enrolled in special education classes due to an ADHD diagnosis, and that Hudgins completed the eleventh grade at Northwest High School prior to being "shot getting off the school bus" and refusing to return to school. *Id.* at 60. A prior report reflected that high school staff believed the shooting was gang-related and Hudgins was subsequently expelled. Hudgins reported that his last period of employment was at Saran Industries where he worked for one day in July 2014 prior to being arrested for the instant offenses. He rated his mental health as fair and stated that he had been previously diagnosed with depression.

[27] He reported using alcohol and marijuana beginning when he was fifteen years old, smoking two or three joints per day prior to his arrest, using heroin while

serving executed time in the Department of Correction, using Xanax in work release, and using synthetic marijuana on the date of the instant offense. His overall risk assessment score puts him in the high risk category to reoffend.

[28] After due consideration of the trial court's decision, we cannot say that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and the character of the offender.

## *Conclusion*

[29] For the foregoing reasons, we affirm Hudgins's convictions and sentence.

[30] Affirmed.

Riley, J., and Altice, J., concur.